UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

F.B.,

　　　　　Plaintiff,

　　v.

KILOLO KIJAKAZI,

　　　　　Defendant.

Case No.  21-01628-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 24

## I.　　INTRODUCTION

On November 2, 2018, F.B.[1] applied for disability benefits ("DIB") under Title II of the Social Security Act alleging disability beginning November 15, 2013.[2]  The claim was denied initially and upon reconsideration, and an administrative law judge ("ALJ") held a hearing on July 28, 2020.  On September 29, 2020, the ALJ denied F.B.'s application, and on January 12, 2021, the Appeals Council denied F.B.'s appeal of the ALJ's decision, making it the final decision of the Defendant Commissioner of the Social Security Administration ("Commissioner").  After the Appeals Council denied review, F.B. sought review in this court pursuant to 42 U.S.C. § 405(g).  Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons

---

[1] Because opinions by the Court are more widely available than other filings and this Order contains potentially sensitive medical information, this Order refers to F.B. using only her initials.

[2] On June 13, 2017, F.B. previously filed an application for disability benefits, which was denied at the administrative level on October 3, 2017.  Administrative Record ("A.R.") 73.  F.B. did not seek reconsideration of the denial of that application, and it became final.  *Id.* at 10.  F.B. moved to reopen the initial application at her July 2020 hearing, but the ALJ denied F.B.'s motion, concluding that she had failed to show good cause.  *Id.* at 32, 10.  While the ALJ reviewed records from the prior application, including the opinions of the state agency consulting physician and psychologist, the ALJ clarified that her decision should not be viewed as an implied reopening of the June 13, 2017 application.  *Id.* at 11 (reviewing A.R. 279-933).

stated below, the Court GRANTS F.B.'s Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS for an immediate calculation and award of benefits.[3]

## II.    BACKGROUND

### A.    The Five-Step Framework

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act.  *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five.  *Id.*  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two.  *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations'

---

[3] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).  Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform.  *Id.*

United States District Court
Northern District of California

3

### B.   Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2)  interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.   20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at 12.00(A)(2)(b).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'Paragraph B' and 'Paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at

4

steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . . "  Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### C.    Factual Background

F.B. was twenty-three years-old at the time of her alleged onset date, November 15, 2013.  She served as an antiterrorism military police officer with the United States Navy for several years in the Middle East until her honorable discharge.  A.R. 1251, 1172.  F.B. was previously married, and her husband was also employed by the United States Navy.  *Id.* at 1172.  She has two young children, one of whom was born in 2015, immediately after the relevant period in this case, November 15, 2013, through June 30, 2015.[4]  *Id.* at 404.

F.B. has a long history of bipolar disorder with psychosis or schizoaffective features, post-traumatic stress disorder ("PTSD"), postpartum psychosis, depression, and anxiety.[5]  *Id.* at 976.

---

[4] To be entitled to Title II (DIB) benefits, F.B. was required to establish disability on or before June 30, 2015.  *See Burch v. Barnhart*, 400 F.3d. 676, 679 (9th Cir. 2005) (DIB claimant must prove she is disabled on or before DLI).  Accordingly, the relevant period for F.B.'s Title II application was November 15, 2013, her alleged onset date, to June 30, 2015.

[5] Medical expert, Dr. George Bell, noted that at times during F.B.'s medical treatment, she was diagnosed with bipolar disorder with schizoaffective features, and, at other times, she was diagnosed with "schizoaffective disorder, bipolar type."  A.R. 35.  He testified that the two disorders "are very difficult to differentiate from each other sometimes."  *Id.*  Dr. Bell ultimately opined, though, that "the primary issue as mentioned by [F.B.'s] counsel is really the 12.04, the bipolar disorder."  *Id.*  Both Dr. Bell and the ALJ subsequently evaluated F.B.'s bipolar disorder pursuant to Listing 12.04 (depressive disorders) as opposed to Listing 12.03 (schizophrenia spectrum and other psychotic disorders).  *See id.* at 14-15, 35, 42; *cf. id.* at 1216 (psychiatrist, Dr. Katherine Taylor, notes in December 2018 that F.B.'s prior diagnosis was bipolar disorder, but that, as of December 2018, it was more properly considered "schizoaffective disorder, bipolar type"; *but see id.* at 2046 (psychiatrist, Dr. Ricque Brister, notes in February 2019 that F.B.'s "[d]iagnosis remains the same bipolar affective disorder. . . with psychotic features"); *see also* Tanya Paul *et al.*, *A Misdiagnosed Case of Schizoaffective Disorder with Bipolar Manifestations*, National Library of Medicine (July 28, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC8394638/ (discussing similarities, differences, and resulting difficulty in diagnosing

United States District Court
Northern District of California

United States District Court
Northern District of California

Between 2014-2019, F.B. was psychiatrically hospitalized no fewer than fourteen times, some voluntary and others involuntary.[6]  *See id.* at 1216 (Psychiatrist, Dr. Katherine Taylor, notes that F.B. had twelve psychiatric hospitalizations from 2016-2018, and an additional hospitalization in 2014); *see also id.* at 2033, 2035, 2045-58 (F.B. is hospitalized again in February-March 2019 for increased paranoia, hallucinations, and suicidal ideations).

Prior to her November 2013 onset date, F.B. suffered from emotional, physical, and sexual childhood trauma, postpartum psychosis, took antidepressants, and was twice hospitalized for full-blown manic episodes.  *Id.* at 47, 320, 651, 688, 1250.  In late 2013, F.B., who had recently begun nursing school, sought treatment for mental health issues, including difficulty sleeping, manic thoughts, memory issues, and difficulty concentrating.  *Id.* at 498-505.  At the time, F.B. was living in New York, where she attended nursing school, and she would return to Travis Air Force Base in California to visit her husband, who was living there.  *Id.* at 670-71.

In May 2014, F.B. screened positive for depression at a mental health examination, and she was diagnosed with anxiety and depression and prescribed medications for both.  *Id.* at 464-91.  She subsequently reported panic attacks, racing thoughts, a "short fuse," and physical symptoms, including shortness of breath and a racing heart.  *Id.* at 893-97; *see also id.* at 317-18 (noting that during first half of 2014, F.B. saw "worsening" of anxiety and depression with "frequent episodes of rageful anger and extreme depression").

In early July 2014, F.B. was visiting her husband in California when he brought F.B. into an emergency room with suicidal thoughts and the "intent/plan to crash her car into a wall or overdose on a bottle of pills."  *Id.* at 317-18.  F.B. was placed on a "5150" hold and was

_____

schizoaffective disorder with bipolar manifestation versus bipolar disorder with schizoaffective features).

[6] On multiple occasions, F.B. was admitted to the psychiatric hospital pursuant to a "5150" psychiatric hold, which allows a "professional person in charge of a facility designated by the county for evaluation and treatment" to "upon probable cause, take, or cause to be taken . . .  into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services" a "person, [who] as a result of a mental health disorder, is a danger to others, or to himself or herself."  Cal. Welfare & Inst. Code § 5150 ("5150") (West 2019); *see also* A.R. 317-18 (July 2014 "5150" hold); 1248 (April 2017 "5150" hold); 2025 (April 2018 "5150" hold); 1171 (October 2018 "5150" hold).

United States District Court
Northern District of California

1  hospitalized for three days.  *Id.* at 317-20, 651-57, 677-78.  She was diagnosed with major

2  depression and bipolar disorder with mania.  *Id.* at 453, 657.  Following her July 2014 psychiatric

3  hospitalization, F.B. subsequently returned to New York for nursing school with the help of her

4  in-laws and husband, who took military leave for a month.  *Id.* at 683-85.

5       In early 2015, F.B. became pregnant with her second child, and she gave birth in August

6  2015.  *Id.* at 424-41.  Soon after, in September and October 2015, F.B. suffered from postpartum

7  psychosis, anxiety, and manic thoughts, and she restarted mental health medications that she had

8  previously discontinued temporarily due to her pregnancy.  *Id.* at 402-20.  In October 2015, F.B.'s

9  husband left F.B. and their infant and young child to attend Navy School out-of-state, and they

10  subsequently divorced in 2016.  *Id.* at 404, 949, 976, 980.

11       F.B. was admitted twice for psychiatric hospitalization in August and September 2016,

12  after presenting with a "death wish" and "strong suicidal ideations."  *Id.* at 949-92.  Her mood was

13  unstable, and she suffered from impulsivity, angry outbursts, panic attacks, uncontrollable worry,

14  manic symptoms, and hallucinations.  *Id.* at 980.  She had an overwhelming feeling that she could

15  not care for her children and keep them safe.  *Id.* at 949.  In addition to her prior medications, she

16  was started on lithium.  *Id.* at 986.  After F.B.'s discharge in late September 2016, she began to

17  feel better and moved back to California to be closer to her own family.  *Id.* at 936-37.

18       However, in February 2017, F.B. was again hospitalized.  *Id.* at 1359-65.  She was

19  subsequently admitted to a psychiatric hospital in April 2017 on a "5150" hold after she became

20  progressively more depressed and was thinking about suicide and had a plan to overdose.  *Id.* at

21  1248-52.  Again, she was diagnosed with bipolar disorder with psychosis and also with severe

22  insomnia, complicated by caring for two young children.  *Id.* at 1248.  F.B. was discharged in late

23  April 2017, but she was admitted to a psychiatric hospital again in August and September 2017

24  with mood instability and suicidal ideation.  *Id.* at 1590.  At that time, F.B. was suffering from

25  auditory hallucinations, and she reported that a voice instructed her to crash her car, jump through

26  a glass window, jump off a bridge, and to poison her grandfather.  *Id.*

27       F.B. subsequently spent a good portion of 2018 psychiatrically hospitalized or in

28  residential treatment centers – including several "5150" holds -- for intrusive suicidal thoughts

with a plan, auditory hallucinations, paranoia, and psychosis.  *See id.* at 1925, 1950, 2020-25, 1792-96, 1858-62, 2280-81, 2228-39, 2178, 1171-79, 1211-16.  F.B. reported feeling like her kids would be "better off without her."  *Id.* at 1925, 2178.  F.B. was discharged in late November 2018, and, in December 2018, appeared less anxious and more stable.  *Id.* at 1216-19.

A couple of months later, in February 2019, F.B. was hospitalized again when her social worker brought her to the emergency room in a nearly catatonic state with increased paranoia, auditory hallucinations, suicidal thoughts.  *Id.* at 2035, 2045-48.  The hospital's attending psychiatrist noted that during F.B.'s numerous hospitalizations, she had been on mood stabilizers and medications for depression, auditory hallucinations, and paranoia, but that the "most profound effect" of all of the treatments so far had been "tremendous weight gain."  *Id.* at 2046.  The psychiatrist stated that F.B.'s treating therapist, psychiatrist, and psychologist all believed that it would be best for F.B. "to be placed outside the home in a 'Board and Care' or residential treatment facility."[7]  *Id.* at 2045.

In July 2020, F.B. testified that she continued to live with her grandparents, who help her take care of her young children.  *Id.* at 46.  F.B. stated that she has been unable to work due to her mental illness since 2013, and that when her military contract ended, she opted to "get out of the military" because it was "hard for [her] to work" given her childcare responsibilities and her mental illness.  *Id.* at 44-45.

### D.    Medical Opinions

In June 2017, in between two psychiatric hospitalizations that year, F.B. filed her prior application for benefits, which was denied on October 3, 2017.  *Id.* at 73.  On October 2, 2017, state agency consulting physician, Dr. Collado, submitted a medical opinion in conjunction with the prior application.[8]  *Id.* at 67.  Dr. Collado concluded that F.B. possessed moderate limitations

---

[7] No further medical records were included in the administrative record following F.B.'s February-March 2019 hospitalization.

[8] The Court acknowledges that what were previously considered "opinions" from state agency medical and psychological consultants have now been relabeled as "prior administrative medical findings."  20 C.F.R. § 416.913(a)(5); *see also* Revisions to Rules, 2016 WL 4702272, 81 Fed. Reg. 62560-01, at 62564 (Sept. 9, 2016).  However, because "prior administrative medical findings" continue to be treated the same as other medical opinions, for clarity, the Court

in conjunction with three out of four of the Paragraph B criteria, including her ability to interact with others, her ability to concentrate, persist, or maintain pace, and her ability to adapt and/or manage herself.  *Id*.  Dr. Collado found that F.B. possessed only a mild limitation in her ability to understand, remember, or apply information.  *Id.*  Dr. Collado further opined that F.B. did not "decompensate[] until after her DLI."  *Id.* at 70.  He concluded that there was no evidence of disability during the relevant time period, and that F.B. was simply "dealing with home and family stressors."  *Id*.  F.B. failed to seek reconsideration of the October 2017 denial.

Subsequently, in February and April 2019, in conjunction with F.B.'s current application, on initial review and reconsideration, respectively, state agency consulting psychologists, Dr. Duffy and Dr. Tessler, concluded that there was "insufficient evidence" to evaluate the Paragraph B criteria for the relevant period, noting that F.B.'s symptoms "appeared to wax and wane."  *Id.* at 81, 92.  As for F.B.'s RFC, on initial review in February 2019, state agency consulting physician, Dr. Bugg, simply stated that there was no severe impairment.  *Id.* at 82.  On reconsideration in April 2019, Dr. Bugg adopted the February 2019 determination, again finding that there was no severe impairment.  *Id.* at 93.

Thereafter, in June 2020, F.B.'s treating psychologist, Dr. Margaret Bailey, submitted a medical opinion on F.B.'s behalf, based on her weekly and sometimes bi-weekly treatment of F.B. for approximately one and one-half years.  *Id.* at 1165-68.  Dr. Bailey diagnosed F.B. with bipolar disorder with psychotic features and with combat-related PTSD.  *Id.* at 1165.  She opined that F.B.'s mental impairments prevented her from sustained functioning for more than one week at a time and that the limitations associated with F.B.'s impairments had lasted at least twelve continuous months.  *Id.* at 1168.  Dr. Bailey ultimately opined that F.B. possessed extreme limitations in two of the Paragraph B categories, including her ability to concentrate, persist, or maintain pace, and her ability to understand, remember, or apply information.  *Id.*  By contrast, Dr.

---

continues to refer to the "prior administrative medical findings" as "opinions" throughout this Order.  *See* 20 C.F.R. § 404.1520c (considering "prior administrative medical findings" in the same manner and using the same factors as "medical opinions"); *see also* 81 Fed. Reg. 62560-01, at 62564 ("We would consider and articulate our consideration of prior administrative medical findings using the same factors we use to consider medical opinions from medical sources.").

1  Bailey found that F.B. possessed mild limitations in terms of her ability to interact with others, and

2  her ability to adapt and/or manage herself.  *Id.*

3  Finally, psychiatrist Dr. George Bell testified as a medical expert ("ME") at F.B.'s July 28,

4  2020 hearing.  *Id.* at 34-44.  Dr. Bell sought clarification at the hearing regarding the relevant time

5  period, noting that he reviewed F.B.'s entire treatment record – not just the medical evidence from

6  the relevant period, November 2013 through June 2015.[9]  *Id.* at 39.  Following guidance from the

7  ALJ, Dr. Bell focused his testimony and opinions on medical evidence from November 2012

8  through October 2015.  *Id.* at 39-44.

9  Dr. Bell testified that, during the relevant period, F.B. suffered from severe bipolar

10  disorder, depression, anxiety, and PTSD.  *Id.* at 40, 34-35.  He noted that "a lot of the things [F.B.]

11  had difficulty with more recently [were] going on back then [during the relevant period]."  *Id.* at

12  39.  Specifically, Dr. Bell stated that the medical records showed that in July 2014, F.B.

13  experienced "[f]requent episodes of rage, rageful anger, and extreme depression" in addition to

14  "[a]ctive suicidal ideations with intent" and "thoughts about wanting to end her life."  *Id.* at 39-40.

15  Dr. Bell explained that although there were not as many records from the relevant period as there

16  were from 2017-2019, that "from [his] experience and reading that record and knowing this

17  illness," F.B. met the severity during the relevant period.  *Id.* at 40.  Dr. Bell further added that,

18  given the 2014 medical records, it was "certainly reasonable to extrapolate [that same opinion] . . .

19

20  [9] Dr. Bell inquired of the ALJ whether he had to "disregard" medical evidence for treatment dated

21  after F.B.'s DLI.  A.R. 36-37.  The ALJ responded that F.B.'s DLI was June 30, 2015, but that
   "treatment [from] October 2015 . . . may very well relate back to impairments that F.B. was
   experiencing in 2015."  *Id.* at 37.  The ALJ added

22
   > I don't know that I would ask you [Dr. Bell] to disregard that because if it is relating
23   > back to [pre-DLI impairments], in the sense that there's functional limitations, then it
   > would be relevant.  That is my problem now.
24
   > . . . .
25
   > We're here to get from you . . . the opinion as to whether there were any severe
26   > impairments during that time.

27  *Id.* at 37-38.  The ALJ subsequently directed Dr. Bell to pay special attention to "exhibits one,
   two, and three," which included F.B.'s medical records from November 2012 through October
28  2015 from the Department of Defense and the United States Air Force – Travis.  *Id.* at 39 (noting
   A.R. 279-933).

United States District Court
Northern District of California

to mid-2013," around the time of F.B.'s alleged onset date. *Id.* at 42.  Dr. Bell also opined that F.B. appeared to have properly complied with the prescribed treatment, and that "she [was] receiving the most conventional treatment available." *Id.* at 43.

Dr. Bell concluded that F.B.'s mental impairments satisfied both Listings 12.04 and 12.06 during the relevant period. *Id.* at 41-42.  As for the Paragraph B criteria, Dr. Bell opined that F.B. possessed marked impairments in two areas:  her ability to concentrate, persist, or maintain pace and her ability to interact with others. *Id.* at 41.  Dr. Bell found that F.B. possessed a moderate limitation in her ability to adapt and/or manage herself, and a mild limitation in her ability to understand, remember, or apply information. *Id.*

### E.    ALJ's Decision

The ALJ ultimately determined that F.B. was not disabled at step five of the disability determination. *Id.* at 21-23.  At step one, the ALJ concluded that F.B. had not engaged in substantial gainful activity from her alleged onsite date, November 15, 2013, through her date last insured ("DLI"), June 30, 2015. *Id.* at 13.  Subsequently, at step two, the ALJ determined that F.B.'s bipolar disorder and anxiety constituted severe impairments. *Id.*

At step three, the ALJ found that F.B.'s impairments, even in combination, did not meet or equal in severity any of the listed impairments, specifically considering Listings 12.04 (depressive disorders) and 12.06 (anxiety and obsessive-compulsive disorders). *Id.* at 14-16.  In making this determination, the ALJ addressed whether the Paragraph B criteria were satisfied. *Id*. at 15-16.  The ALJ found that F.B. possessed moderate limitations in three of the four functional Paragraph B categories, including her ability to interact with others, her ability to concentrate, persist, or maintain pace, and her ability to adapt and/or manage herself. *Id.* at 14-16.  By contrast, the ALJ determined that F.B.  possessed only a mild limitation in terms of her ability to understand, remember, or apply information. *Id.* at 14.  The ALJ thus concluded that F.B. did not satisfy the Paragraph B criteria because she did not have two marked limitations or one extreme limitation in the functional categories. *Id.* at 15.  In assessing F.B.'s Paragraph B limitations, the ALJ relied on the October 2017 opinion of state agency consultant, Dr. Collado. *See id.* at 14-15 (citing to A.R. 67).  The ALJ further found that F.B. did not meet the paragraph C criteria, either. *Id.*

11

1    At step four, the ALJ found that F.B. had the residual functional capacity ("RFC") to

2    perform " a full range of work at all exertional levels" but was limited to "simple[,] routine tasks

3    involving no more than occasional contact with the public, supervisors, or coworkers." *Id.* at 16

4    In reaching this RFC, the ALJ again found the October 2017 opinion of state agency

5    consultant, Dr. Collado, was persuasive. *Id.* at 18 (citing *id.* at 67). By contrast, the ALJ rejected

6    as unpersuasive ME Dr. Bell's opinion regarding F.B.'s limitations. *Id.* at 19-20 (discussing *id.* at

7    41-42). The ALJ also rejected the July 2020 opinion from F.B.'s treating psychologist, Dr. Bailey,

8    as unpersuasive, concluding that it was irrelevant. *Id.* at 20-21.

9    **III.    ISSUES FOR REVIEW**

10    F.B. seeks reversal of the Commissioner's denial of benefits for three reasons, arguing

11    that:

12    (1)    the ALJ erred in evaluating the persuasiveness of medical expert, Dr. Bell's

13        opinion;

14    (2)    the ALJ erred at steps two and three in her Paragraph B assessment and subsequent

15        conclusion that F.B.'s mental impairments failed to satisfy Listings 12.04 and

16        12.06; and

17    (3)    the ALJ erred at step five in finding that there were other jobs for F.B.[10]

18    **IV.    DISCUSSION**

19    **A.    Standard of Review**

20    District courts have jurisdiction to review the final decisions of the Commissioner and may

21    affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

22    hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). When reviewing the

23    Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are

24    free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence

25    as a reasonable mind might accept as adequate to support a conclusion" and that is based on the

26    entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971). "'Substantial evidence' means

27    

28    ────────────────────
[10] F.B. briefed issues one and two, which are distinct but related, as one issue. The Court, however, has addressed the issues separately.

more than a mere scintilla," *id*., but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B.    Post-DLI Records

At the outset, the Court notes that while there is sufficient medical evidence from the relevant period, the majority of the medical evidence contained in the administrative record post-dates F.B.'s June 30, 2015 DLI. *See* A.R. 297-933 (medical evidence from the Department of Defense and United States Air Force-Travis dated November 2012 through October 2015); *cf. id.* at 934-2298 (medical evidence from multiple sources, including providers and hospitals, dated August 2016 through March 2019). The ALJ acknowledged this fact at the hearing and in her decision. *See id.* at 10-11 (noting that "[t]he majority of the records in this case pertain to a period after the expiry of the date last insured"); *id.* at 37 (noting at hearing that post-DLI treatment records may "very well relate back to impairments that [F.B.] was experiencing in 2015"). However, other than to reject F.B.'s treating psychologist's 2020 opinion as "not relevant to the pertinent period," the ALJ did not explicitly rule as to how she considered the post-DLI evidence.[11] *Id.* at 10-11, 20-21.

---

[11] The ALJ rejected Dr. Bailey's 2020 opinion because Dr. Bailey did not begin seeing F.B. until January 2019, several years after F.B.'s DLI. A.R. 20-21; *id.* at 1165. Contrary to ME Dr. Bell's testimony regarding the relationship between F.B.'s more recent condition and her condition during the relevant period, the ALJ found that Dr. Bailey's opinion did not "speak to the level of functioning and mental status documented within the relevant timeframe." *Id.* at 21; *but see id.* at 39 (Dr. Bell's testimony that "a lot of the things [F.B.] had difficulty with more recently [were] going on back then [during the relevant period]"). For the reasons discussed below, the ALJ's rejection of Dr. Bailey's opinion on relevance grounds was likely error because F.B.'s 2019-2020 mental health impairments were the same chronic impairments from which she suffered pre-expiration in November 2013-June 2015. *See id.* at 39. However, on appeal, F.B. has not challenged the ALJ's rejection of Dr. Bailey's opinion, and, therefore, the Court does not reach the issue.

1   "The Ninth Circuit has recognized that "[m]edical reports are inevitably rendered

2   retrospectively," *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988), and that "given the

3   continuity requirement for disability claims made after the expiration of insured status, '[t]he

4   claimant may establish such continuous disabling severity by means of a retrospective diagnosis.'"

5   *Mou v. Berryhill*, No. 15-CV-05194-JCS, 2017 WL 1177978, at *20 (N.D. Cal. Mar. 30, 2017)

6   (quoting *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1461 (9th Cir. 1995)).  Where

7   medical opinions "refer back" to the same chronic condition and symptoms discussed in earlier

8   medical records – even those from several years prior -- the "fact that [the most recent] opinions

9   were issued significantly after [the F.B.'s] DLI does not undercut the weight those opinions are

10   due."  *Svaldi v. Berryhill*, 720 F. App'x 342, 343–44 (9th Cir. 2017).

11       Contrary to the ALJ's treatment of Dr. Bailey's opinion, the Court notes that the ALJ, at

12   other times, appears to have appropriately recognized that the post-DLI evidence, which pertained

13   to F.B.'s "pre-expiration condition[s]," was relevant and required consideration on the merits.  *See*

14   *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996) ("medical evaluations made after the expiration

15   of a claimant's insured status are relevant to an evaluation of the pre-expiration condition").

16   Notably, the ALJ cited to post-DLI evidence in support of her own Paragraph B findings and her

17   evaluation of Drs. Collado's and Bell's opinions.  *See* A.R. 14-15, 18 (citing *id.* at 937, 950-92,

18   1069, 1215, 1219 in support of Paragraph B findings and evaluation of Dr. Collado's opinion)

19   (F.B.'s treatment records from 2016 and 2018); *see also id.* at 19-20 (citing *id.* at 937, 950-92,

20   1069 in support of rejection of Dr. Bell's opinion) (F.B.'s treatment records from 2016).

21       Here, as the testifying medical expert, Dr. Bell, recognized, F.B.'s post-DLI mental health

22   impairments and their related limitations – including F.B.'s bipolar disorder, PTSD, psychosis,

23   depression, and anxiety – were chronic and were related to the very impairments from which F.B.

24   suffered during the relevant period.  *See id.* at 39.  Although they varied in intensity at times,

25   F.B.'s symptoms and diagnoses remained relatively consistent from 2014-2019.  For example,

26   F.B. frequently suffered from rage and anger, intense depression, suicidal thoughts and ideation,

27   panic attacks, hallucinations, and manic symptoms.  *See id.* at 464-84 (depression and anxiety

28   diagnosis in May 2014); 893 (2014 symptoms); 317-19 (symptoms and diagnosis related to 2014

United States District Court
Northern District of California

14

"5150" hold); 654, 688 (noting "unresolved childhood trauma" in 2014); 441 (F.B. throws a television in rage and cries all morning in 2015); 424 (F.B. has thoughts of "self-harm" after argument with husband in 2015); 403 (F.B. suffers from postpartum depression in 2015); 976-80 (F.B. admitted to psychiatric hospital in 2016 with impulsivity, panic attacks, hallucinations, and suicidal ideations); 1248-52, 1590 (F.B. admitted to psychiatric hospitals in 2017 with depression, plan for suicide, hallucinations); 2025, 1792, 2280, 2228 (F.B.'s 2018 admissions to psychiatric hospitals with schizoaffective disorder, bipolar type, following suicidal ideations, "profound" depression, hallucinations, and paranoia); 2045-58 (2019 psychiatric hospital admission noting that F.B. who has "previously" been observed as "fairly high functioning" should be housed in a residential psychiatric facility).  Accordingly, the post-DLI medical evidence and opinions were relevant to the ALJ's decision and are likewise relevant to the Court's adjudication of the instant appeal.

### C.     ALJ's Evaluation of Dr. Bell's Medical Opinion

The ALJ found that Dr. Bell's July 2020 opinion that F.B. possessed two marked Paragraph B limitations and met Listings 12.04 and/or 12.06 was "unsupported by the medical record" and "inconsistent with evidence from medical treatment notes and reviewing sources." *Id.* at 20.  By contrast, the ALJ found that state agency consultant Dr. Collado's October 2017 contrary opinion was persuasive because it was "supported by the objective medical evidence and the overall record." *Id.* at 18.

The ALJ provided identical reasons and nearly identical record citations in support of her adoption of Dr. Collado's opinion and her rejection of Dr. Bell's opinion. *Id.* at 18, 20. Specifically, the ALJ found that "[u]pon mental status or psychiatric examination:"

> [F.B.] typically was oriented, open, cooperative, friendly, had fair eye contact, relaxed posture, logical and goal directed thought process, normal psychomotor, appropriate affect, appropriate thought content, grossly intact memory, fair insight, fair judgment, normal impulse control, and reported no auditory or visual hallucinations or suicidal or homicidal ideation.

*Id.* at 18, 20 (citing *id.* at 321, 374-75, 655-56, 686, 736, 758, 595, 937, 950-92, 1096, 1215,

1219).[12]  Additionally, the ALJ asserted that

> Dr. Bell himself was equivocal regarding the findings during the relevant period in stating that there was a need to extrapolate in order to rate the [Paragraph] B criteria level of impairment, and to this extent, his opinion as to the listing criteria is not persuasive.

*Id.* at 20.

F.B. argues that the ALJ's decision to reject Dr. Bell's opinion regarding the listings and F.B.'s Paragraph B impairments was not supported by substantial evidence.  For the reasons that follow, the Court agrees.

### 1. Legal Standards

For claims filed before March 27, 2017, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'"  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).  However, the regulations regarding evaluation of medical evidence have been amended and several of the prior Social Security Rulings, including Social Security Ruling 96-2p ("Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims filed after March 27, 2017, as is the case here.  *See* Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c (a), 416.920c(a).

The new regulations provide that the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  20 C.F.R. § 416.920c(a).  Contrary to F.B.'s argument otherwise, they "displace [the Ninth Circuit's] longstanding case law" requiring an ALJ to articulate "specific and legitimate reasons" for rejecting a treating physician's opinion where the opinion is contradicted by other medical opinions.  *Woods v. Kijakazi,* 32 F.4th 785, 787, 791 (9th Cir. 2022).

---

[12] The Court notes that the ALJ also cited identical reasons and record evidence in support of her Paragraph B findings.  *See* A.R. 14, 15.

16

Under the new regulations, the Commissioner instead must consider all medical opinions and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors." 20 C.F.R. § 416.920c(a)-(c). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that "form[ed] the foundation of the [prior] treating source rule." [13]  Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853; *see also Woods*, 32 F.4th at 791-92. The ALJ is required to explicitly address supportability and consistency in their decision. 20 C.F.R. § 404.1520c(b)(2). As with all other determinations made by the ALJ, the ALJ's persuasiveness explanation must be supported by substantial evidence. *See Woods,* 32 F.4th at 787.

With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). Regarding "consistency," the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

Typically, the ALJ "may, but [is] not required to," explain how they considered the remaining three factors listed in the regulations. *Id.* However, where two or more distinct medical opinions are equally supported and consistent, the ALJ should articulate how they considered factors other than supportability and consistency, including the treatment relationship, the extent of specialization, and any other relevant factors. *See* 20 C.F.R. §§ 404.1520c(b)(3),

---

[13] F.B., while recognizing that the law regarding the evaluation of medical opinions changed in 2017, nevertheless proceeded to erroneously argue the issue pursuant to pre-2017 standards only, failing to address entirely the requisite supportability and consistency criteria. *See* Dkt. No. 20 at 10; Dkt. No. 25 at 3, 7. F.B.'s counsel is advised that in future cases in which the 2017 Rule Revisions apply, counsel must address the controlling legal standards – the supportability and consistency of the medical opinion(s). *See* Civil L.R. 16-5 (incorporating the standards set forth in Civil L.R. 7-2 and Fed. R. Civ. P. 56).

United States District Court
Northern District of California

416.920c(b)(3); *see also Woods,* 32 F.4th at 792 (discussing 20 C.F.R. § 404.1520c(b)(3)) ("In that case, the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'").

### 2.    Analysis

#### a.    Dr. Bell's "Equivocation"

The ALJ's suggestion that Dr. Bell's opinion was less supportable than Dr. Collado's opinion because Dr. Bell was "equivocal regarding the findings during the relevant period" and because Dr. Bell needed to "extrapolate . . . to rate" the Paragraph B criteria mischaracterizes both Dr. Bell's testimony and the relevance of the post-DLI medical evidence.  A.R. 20.

In terms of the supportability of their opinions, Dr. Collado and Dr. Bell were both non-examining physicians who offered medical opinions based on their review of the medical evidence.  Neither conducted their own independent tests or interviewed or examined F.B. in conjunction with their medical opinions.

However, when Dr. Bell offered his opinion in connection with F.B.'s current application at her July 2020 hearing, he had the benefit of a more fully developed medical record, which included F.B.'s treatment records from 2017-2019, and the opinion of F.B.'s treating psychologist, Dr. Bailey.  By contrast, Dr. Collado issued his opinion in October 2017 in connection with F.B.'s prior application.  At the time Dr. Collado provided his written opinion, he reviewed F.B.'s medical evidence through October 26, 2016.  *See id.* at 65.  Dr. Collado thus lacked the medical evidence regarding F.B.'s eleven additional 2017-2019 psychiatric hospitalizations and Dr. Bailey's opinion in conjunction with his review and 2017 opinion.  *See id.* at 1216, 2045-58, 1165-68.

Moreover, Dr. Bell definitively opined that F.B. satisfied Listings 12.04 and 12.06 based on his review of medical records from the relevant period.[14]  *See id.* at 39-40 (referencing his notes

---

[14] As noted, Dr. Bell sought clarification from the ALJ at the hearing regarding the evidence on which he was permitted to base his opinion.  A.R. 36-39.  The ALJ noted the complexity of the issue and advised Dr. Bell that determining whether post-DLI evidence related back to F.B.'s impairments during the relevant time period was a legal issue beyond the scope of the medical issues Dr. Bell was retained to consider.  *See id.* at 37 (stating that post-DLI evidence "may very well relate back" to impairments during the relevant period and was "[the ALJ's] problem now");

1   regarding United States Air Force medical records from May through July 2014); *id.* at 42.  As for

2   the Paragraph B criteria, Dr. Bell unequivocally assessed F.B. with two marked limitations, basing

3   his findings on Department of Defense and United States Air Force records from November 2012

4   through July 7, 2014.[15]  *See id.* at 41.  Nor did Dr. Bell engage in any more "extrapolation"

5   regarding the severity of F.B.'s impairments during the relevant period than did Dr. Collado or

6   any other non-examining medical source who offered an opinion based on their review of the

7   medical record.

8          Finally, following the ALJ's redirection, Dr. Bell indeed based his opinion on F.B.'s

9   medical records from November 2012 through October 2015.  *See id.* at 39.  Nevertheless, as

10  discussed above, the post-DLI medical evidence and opinions were relevant to the severity of and

11  limitations associated with F.B.'s "pre-expiration condition[s]."  *See Lester*, 81 F.3d at 832.  Thus,

12  to the extent that Dr. Bell's review of the entire medical record may have influenced his opinion --

13  including his review of the post-DLI evidence -- such a broad review of the record would have

14  enhanced rather than have undermined the supportability of Dr. Bell's opinion.[16]  *See id.*

15         For all of these reasons, Dr. Bell's opinion was more supportable than Dr. Collado's

16  opinion, and the ALJ's conclusion otherwise was not supported by substantial evidence.

17         **b.      Mental Health Examination Findings**

18         In concluding that Dr. Bell's opinion was inconsistent with and unsupported by the

19  longitudinal record, the ALJ also relied on "cherry-picked" and misleading notations.  *See* A.R.

20  18, 20 (citing *id.* at 321, 374-75, 655-56, 686, 736, 758, 595, 895, 937, 950-92, 1096, 1215, 1219);

21  _____

22  *see also id.* at 38 (reassuring Dr. Bell that he was "not retained to look at the legal issues").

23  [15] Dr. Bell clearly limited his findings to the relevant period, as demonstrated when he contrasted
    his own finding that F.B. possessed only a mild limitation in her understanding and remembering
24  with the extreme limitation that F.B.'s treating psychologist opined to in her 2020 opinion.  A.R.
    41 (noting that "even though the more recent rating by [F.B.'s] therapist rated her as marked for
25  that area, [Dr. Bell] didn't see any evidence in the [relevant period] records to say that [F.B.] had
    marked difficulty there").

26  [16] On a related note, the ALJ suggested that Dr. Collado's opinion was more persuasive because it
    was "based on a review of the case record during the relevant period."  A.R. 18.  However, given
27  the scope of Dr. Bell's record review and the relevance of the post-DLI evidence, this proffered
    reason did not constitute substantial evidence rendering Dr. Collado's opinion more supportable
28  than Dr. Bell's opinion.

United States District Court
Northern District of California

*see also Diedrich v. Berryhill*, 874 F.3d 634, 642 (9th Cir. 2017) (improper for ALJ to "cherry-pick" absence of certain symptoms from medical evidence as opposed to undertaking a "broader development" of the evidence in its entirety).   At least five of the ALJ's thirteen record citations were to observations made by medical sources during F.B.'s psychiatric hospitalizations – or during her admission to or discharge from psychiatric hospitalizations.  *See* A.R. at 321, 655-56, 374-75, 736, 950-92.  For example, the ALJ cited to a social worker's July 3, 2014 observation of F.B. while she was hospitalized following her "5150" admission the prior day, July 2, 2014.  *See id.* at 14, 15, 28, 20 (citing A.R. 321 or "1F/43").  In the July 3, 2014 progress notes, the social worker stated that F.B., who was "in hospital pajamas," was "open, friendly, cooperative, receptive," and "alert, awake, [and] responsive to surroundings." *Id.* at 321; *see also id.* at 14, 15, 28, 20 (citing A.R. 655-56 or "1F/377-78") (July 3, 2014 progress notes from psychiatrist observing that on the day following her "5150" admission, F.B. was "open, friendly, cooperative, and receptive," and "appropriate and reactive").   However, the ALJ's selective citations completely ignore the context:  that F.B. was, at the time, psychiatrically hospitalized after admission the previous day for plans of suicide following months of medical visits for panic attacks, anxiety, and depression.  *See id.* at 895-97, 464-84, 491-505, 317-20; *see also, e.g., id.* at 14, 15, 28, 20 (citing A.R. 374-75 or "1F/96-97") (observing that F.B. was "fully oriented" with "good grooming" on July 4, 2014, two days after her "5150" admission for mood disturbance, depression, and a plan to commit suicide by crashing her car or overdosing); *id.* at 14, 15, 28, 20 (citing A.R. 736 or "2F/1," which is a duplicate of A.R. 374, previously cited by ALJ).

Similarly, the ALJ also cites to medical records from F.B.'s two nearly back-to-back psychiatric hospitalizations at Guthrie Robert Packer Hospital from August 23-30, 2016, and September 14-21, 2016, in addition to F.B.'s outpatient treatment in between those two admissions.  *See id.* at 14, 15, 28, 20 (citing A.R. 950-92 or "4F/17-59").  F.B. experienced both good and bad moments during the 2016 psychiatric hospitalizations.  For example, a clinician's September 18, 2016 progress notes during F.B.'s psychiatric hold stated that while F.B. had "[c]lear emotional dysregulation," she was "[d]oing a little better," and that she "denie[d] thoughts of self harm," and was "pleasant on approach."  *Id.* at 967, 968; *see also id.* at 971 (noting at

September 21, 2016 discharge that "there appeared to be no evidence that patient posed an imminent threat to herself or others" and that, during hospitalization, "[s]uicidal ideation resolved" and her "mood improved"); *but see, e.g., id.* at 985-87 (observing on August 25, 2016, two days following first admission, F.B. was "tearful, depressed, dysphoric," with "some suicidal ideation," and needs "close monitoring for safety and medication side effects" as she is started on lithium). The "positive" observations during the 2016 hospitalizations were characteristic of F.B.'s waxing and waning condition, and such fluctuations took place both inside and outside of F.B.'s numerous psychiatric hospitalizations. *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances, it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."); *L.L. v. Kijakazi*, No. 20-CV-07438-JCS, 2022 WL 2833972, at *15 (N.D. Cal. July 20, 2022) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001))(noting that "it is an error to reject a claimant's testimony based on isolated instances of improvement, since symptoms regularly wax and wane during treatment").

In addition to the citations to F.B.'s psychiatric hospitalization records, the ALJ also relied on records from psychiatric follow-up visits in October 2016 and December 2018, following F.B.'s psychiatric hospitalizations. *See* A.R. 14, 15, 18, 20 (citing A.R. 937 or "4F/4"); *see also id.* at 15, 18 (citing A.R. 1215, 1219, or "14F/46, 50"). The physician assistant's progress notes from F.B.'s October 26, 2016 follow-up visit, as cited by the ALJ, state that F.B. was "alert, well[-]appearing, and in no distress" that day, consistent with F.B.'s own report that she was "feeling well" with "no depressive thoughts." *Id.* at 936-37. At the time, F.B. remained on multiple mental health medications, including lithium, Zyprexa, and Lamictal. *Id.* at 936. Unfortunately, F.B.'s noted stability was short-lived, though, and in early 2017, F.B. was again psychiatrically hospitalized for increasing depression and mania. *Id.* at 1320-22, 1359-65.

The ALJ also relied on November and December 2018 progress notes from psychiatrist, Dr. Katherine Taylor, during a time immediately after F.B. was discharged from her third "5150" psychiatric hospitalization in a period of only two months. *See id.* at 1172; *id.* at 15, 18 (citing

A.R. 1215, 1219, or "14F/46, 50").  The first of the two cited medical records include Dr. Taylor's progress notes from the day that F.B. was discharged from the hospital, November 28, 2018.  *Id.* at 1211-16.  The ALJ cited to notations that F.B. denied any suicidal ideation and/or hallucinations that day.  A.R. 15, 18 (citing A.R. 1215).  However, the progress notes simultaneously reflect that that F.B.'s mood was "depressed" and "going down pretty fast right now," and that her judgment and insight were "limited by illness."  *Id.* at 1215.

In the December 12, 2018 progress notes from Dr. Taylor, as cited to by the ALJ, F.B. returned for an outpatient follow-up visit.  *Id.* at 1216-20.  During that visit, F.B. notes that she had noticed less anxiety and irritability following a recent medication change and that she had no plan or action for suicide.  *Id.* at 1216.  Dr. Taylor also observed that F.B. "appear[ed] more stable, less reactive, [and] not specifically depressed or anxious."  *Id.* at 1219.  However, two months later, in February 2019, F.B. was again hospitalized for suicidal thoughts, paranoia, and hallucinations.  *See id.* at 2035, 2045-48.

In sum, in a record replete with psychiatric emergencies and hospitalizations, the ALJ selected several routine and often misleading findings in support of her evaluation of  Dr. Bell's and Dr. Collado's medical opinions.  The psychiatrists and clinicians who treated and observed F.B. throughout the years noted that, at times, F.B. seemed "very high functioning."  *See id.* at 2045.  Indeed, F.B. had a military career, enrolled in nursing school, and was raising two children.  *See id.* at 1172, 320.  However, the record also very clearly demonstrates that F.B.'s military career ended due to her mental health challenges, as did her pursuit of a nursing degree.  *See id.* at 45-46, 2045.  Additionally, the record further shows that F.B.'s mental health struggles resulted in many extra challenges and hardships on top of her normal childcare obligations and family responsibilities.  *See id.* at 985, 949, 2178.  Notably, for years, F.B. has lived with and required help from her own grandparents in caring for her children, simultaneously struggling with guilt and depression regarding her inability to care for her children in the manner she desires because of her mental illness.  *See id.; see also id.* at 46.  Review of the longitudinal record reveals that F.B. undoubtedly suffered from severe mental health impairments, whose symptoms and limitations well surpassed the stresses and overwhelm typically associated with raising a family and

1   caregiving.  *But see id.* at 70 (In support of his October 2017 opinion, Dr. Collado minimizes

2   F.B.'s mental health impairments, suggesting that "it appears that she was dealing with home and

3   family stressors" associated with attending nursing school, becoming pregnant and taking care of

4   children).

5       For these, and all of the reasons stated above, the ALJ's conclusion that Dr. Bell's opinion

6   was not supportable or consistent with the record was not based on substantial evidence.  Nor was

7   the ALJ's adoption of Dr. Collado's opinion supported by substantial evidence. [17]  Instead, review

8   of the longitudinal record, as described above, establishes that Dr. Bell's opinion was more

9   supportable and consistent than that of Dr. Collado, and was therefore entitled to greater weight.

10  *See* 20 C.F.R. § 416.920c(c)(1)&(c)(2).

**D.     ALJ's Steps Two and Three Findings**

12      As noted, Dr. Bell found that F.B. possessed marked limitations in two Paragraph B

13  categories --  her ability to interact with others and her ability to concentrate, persist, and/or

14  maintain pace -- such that she would have been rendered disabled under Listings 12.04 and 12.06.

15  A.R. 41-42.  The ALJ, however, adopted Dr. Collado's opinion and found that F.B. possessed only

16  moderate limitations in those two categories.  *Id.* at 14, 15; A.R. 67.

17      In support of her Paragraph B findings, the ALJ asserted reasons identical to those she

18  proffered in support of her evaluation of Dr. Bell's and Dr. Collado's opinions.  *Id.* at 14-15.  The

19  ALJ reiterated that "[u]pon mental status or psychiatric examination:"

> [F.B.] typically was oriented, open, cooperative, friendly, had fair eye contact,
> relaxed posture, logical and goal directed thought process, normal psychomotor,
> appropriate affect, appropriate thought content, grossly intact memory, fair insight,
> fair judgment, and normal impulse control.

[17] The ALJ additionally reasoned that Dr. Collado's opinion was more consistent and supportable simply because Dr. Collado "has an understanding of Social Security disability program policies and their evidentiary requirements." A.R. 18.  However, "familiarity with [Social Security Administration] SSA guidelines is irrelevant to the validity of a physician's opinion."  *T.N. v. Kijakazi*, No. 20-CV-07518-VKD, 2022 WL 2222967, at *6 (N.D. Cal. June 21, 2022) (citing *Sweeney v. Saul*, No. 2:18-CV-02495 KJM AC, 2019 WL 7038374, at *7 (E.D. Cal. Dec. 20, 2019), report and recommendation adopted, No. 2:18-CV-02495 KJM AC, 2020 WL 798669 (E.D. Cal. Feb. 18, 2020)).

*Id.* at 14 (discussing F.B.'s ability to interact with others); *id.* at 15 (discussing F.B.'s ability to concentrate, persist, and/or maintain pace). The ALJ also listed identical record citations in support of her Paragraph B findings. *See id.* at 14, 15 (citing *id.* at 321, 374-75, 655-56, 686, 736, 758, 595, 937, 950-92, 1096, 1215, 1219 in support of Paragraph B findings); *id.* at 18 (citing *id.* at 321, 374-75, 655-56, 686, 736, 758, 595, 937, 950-92, 1096, 1215, 1219 in support of adoption of Dr. Collado's opinion as persuasive); *id.* at 20 (citing *id.* at 321, 374-75, 655-56, 686, 736, 758, 595, 937, 950-92, 1096 in support of rejection of Dr. Bell's opinion).

In an argument related to the medical opinions, F.B. contends that had the ALJ properly evaluated Dr. Bell's opinion, the ALJ would have concluded that she possessed at least two marked Paragraph B limitations such that she subsequently met or equaled Listings 12.04 and 12.06, thus rendering her disabled. As presented by F.B., this is a narrow challenge to the ALJ's Paragraph B assessment, and thus concerns only the Paragraph B criteria on which the ALJ's findings diverged from Dr. Bell's opinion.[18] *See* Dkt. No. 20 at 10; Dkt. No. 25 at 2, 7, 10. The Commissioner counters that the Court should uphold the ALJ's Paragraph B findings for the reasons cited by the ALJ.

### 1. Legal Standards

As noted, if the ALJ finds a medically determinable mental impairment, as the ALJ did here, the ALJ then must assess the degree of functional limitations resulting from the claimant's mental impairment with respect to the following functional areas, known as the "Paragraph B" criteria: 1) the claimant's ability to understand, remember, or apply information; 2) the claimant's ability to interact with others; 3) the claimant's ability to concentrate, persist, or maintain pace; and 4) the claimant's ability to adapt or manage oneself. *See* 20 C.F.R. §§ 404.1520a(b)(2), (c)(3).

Rating the degree of functional limitation at step two is a highly individualized process that requires the ALJ to consider all relevant evidence to determine the extent to which a claimant's

---

[18] F.B. has *not* presented an independent challenge to the ALJ's Paragraph B findings that were consistent with Dr. Bell's opinion. *See* Dkt. No. 20 at 10; Dkt. No. 25 at 2, 7, 10. Accordingly, the ALJ's findings that F.B. possessed a moderate limitation in her ability to adapt and/or manage herself, and a mild limitation in terms of her ability to understand, remember, or apply information were consistent with Dr. Bell's opinion, and, as such, are not at issue on appeal.

United States District Court
Northern District of California

impairment interferes with her "ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c), 416.920a(c).  The ALJ rates the degree of limitation in each of the four areas using a five-point scale: "None, mild, moderate, marked, and extreme."  *Id.*; *see also Hoopai v. Astrue*, 499 F.3d 1071, 1077–78 (9th Cir. 2007).

Under Paragraph B, a claimant's mental disorder renders him disabled if it "result[s] in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(A)(2)(b).  A claimant has an "extreme" limitation if she is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).  A claimant has a "marked" limitation if her "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d). By contrast, a claimant has a "moderate" limitation if her "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(c).

### 2. Analysis

The ALJ's Paragraph B findings regarding F.B.'s ability to interact with others and to concentrate, persist, and/or maintain pace were not supported by substantial evidence.  First, the ALJ relied on Dr. Collado's opinion, which, as the Court has concluded above, was less supportable and consistent with the longitudinal evidence and therefore entitled to less weight than Dr. Bell's opinion.  Second, the evidence cited by the ALJ actually demonstrates that F.B. possessed, at a minimum, serious or marked limitations – as opposed to moderate limitations – in her abilities to interact with others and to concentrate.  *See* 20 C.F.R. §§ 404.1520a(b)(2), (c)(3).

None of the ALJ's cited records pertain to F.B.'s ability to interact in or concentrate in a work environment.  In fact, as discussed in detail, many of the ALJ's citations are to progress notes that were taken *during* F.B.'s multiple psychiatric hospitalizations for suicidal ideation, hallucinations, paranoia, bipolar disorder, anxiety, and depression.  *See* A.R. 321, 655-56, 374-75, 736, 950-92; *see also id.* at 895-97, 484-64, 491-505, 317-20.  The nature of the cited records themselves – inpatient psychiatric hospitalization records -- suggests that F.B.'s abilities to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    concentrate and to interact with others in a work environment were, at a minimum, "marked" or

2    seriously limited, if not curtailed entirely. [19]  The remaining records cited by the ALJ were from

3    select psychiatric follow-up appointments, and, at best, demonstrated that any limitations

4    regarding F.B.'s social abilities and concentration waxed and waned both inside and outside of

5    psychiatric hospitals.  *See id.* at 937, 1215, 1219.  The occasional and short-lived improvement to

6    F.B.s symptoms did not, however, undermine the serious or marked limitations associated with her

7    mental impairments.  *See Garrison*, 759 F.3d at 1017.

8         In sum, Dr. Bell's conclusion that F.B. possessed marked limitations in her abilities to

9    interact with others and to concentrate, persist, and/or maintain pace was supported by and

10   consistent with the relevant, longitudinal evidence.  Consequently, given the existence of two

11   marked Paragraph B limitations, the ALJ was required to conclude that F.B. met Listings 12.04

12   and 12.06, thus rendering her disabled at step three of the sequential analysis.  *See* 20 C.F.R. § Pt.

13   404, Subpt. P, App. 1, 12.00(A)(2)(b).

14        **E.    ALJ's Step Five Analysis**

15        Because the Court concludes below that F.B. is entitled to an award of benefits based on

17   [19] The relevant regulation defines "concentrat[ing], persist[ing], or maintain[ing] pace" as

18        the abilities to focus attention on work activities and stay on task at a sustained rate.
19        Examples include: Initiating and performing a task that you understand and know
     how to do; working at an appropriate and consistent pace; completing tasks in a
20        timely manner; ignoring or avoiding distractions while working; changing activities
     or work settings without being disruptive; working close to or with others without
21        interrupting or distracting them; sustaining an ordinary routine and regular
     attendance at work; and working a full day without needing more than the allotted
22        number or length of rest periods during the day.

23   20 C.F.R., Pt. 404, Subpart P, App. 1, § 12.00(E)(3) (2018).  By comparison, it defines
     "interact[ing] with others" as

24        the abilities to relate to and work with supervisors, co-workers, and the public.
25        Examples include: cooperating with others; asking for help when needed; handling
     conflicts with others; stating own point of view; initiating or sustaining
26        conversation; understanding and responding to social cues (physical, verbal,
     emotional); responding to requests, suggestions, criticism, correction, and
27        challenges; and keeping social interactions free of excessive irritability, sensitivity,
     argumentativeness, or suspiciousness.

28   20 C.F.R., Pt. 404, Subpart P, App. 1, § 12.00(E)(2) (2018).

1    the ALJ's errors in evaluating Dr. Bell's opinion and in her related Paragraph B and listings

2    determinations at steps two and three, the Court need not reach this issue.

3        **F.    Remedy**

4        "A district court may affirm, modify, or reverse a decision by the Commissioner 'with or

5    without remanding the cause for a rehearing.'" *Garrison*, 759 F.3d at 1019 (quoting 42 U.S.C. §

6    405(g)) (emphasis omitted).  "If additional proceedings can remedy defects in the original

7    administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654

8    F.2d 631, 635 (9th Cir. 1981).  On the other hand, the Court may remand for award of benefits

9    under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for

10   rejecting evidence, whether claimant testimony or medical opinion;" (2) "there are [no]

11   outstanding issues that must be resolved before a disability determination can be made" and

12   "further administrative proceedings would [not] be useful;" and (3) "on the record taken as a

13   whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041,1045 (9th Cir. 2017)

14   (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

15   a district court abused its discretion in declining to apply the "credit-as-true" rule to an appropriate

16   case.  The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt

17   as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

18   *Garrison*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and ambiguities."

19   *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

20       An award of benefits is warranted in this case.[20]  First, for the reasons set forth above, the

21   ALJ's rejection of Dr. Bell's opinion was not supported by substantial evidence.  Second, "there

22   are [no] outstanding issues that must be resolved before a disability determination can be made"

23   and "further administrative proceedings would [not] be useful." *Garrison*, 759 F.3d at 1021.

24   Here, the record consists of nearly 2,300 pages and includes multiple medical opinions, records,

25   _____

26   [20] While applying the "credit-as-true" rule here, the Court acknowledges that the Ninth Circuit
     recently noted the SSA's concerns regarding rule.  *See Woods,* 32 F.4th at 791 (discussing
27   Revisions, 81 Fed. Reg. at 62,573).  However, the *Woods* Court did not directly address the issue,
     and the "credit-as-true" rule remains controlling precedent in the Ninth Circuit.  *See* 32 F.4th at
28   791.

United States District Court
Northern District of California

and medical evidence from several psychiatric hospitals and psychiatrists spanning a period of six years. *See generally* A.R. 1-2298. Importantly, it also includes testimony from medical expert, Dr. Bell, specifically employed by the SSA to assist the ALJ in determining the extent of F.B.'s mental impairments and limitations during the relevant period in this case. *See id.* at 34-43. The fully developed longitudinal record supports Paragraph B limitations commensurate with the limitations opined to by Dr. Bell, which, in turn, require a finding that F.B. meets the requirements of Listings 12.04 and 12.06. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

Finally, "on the record taken as a whole, there is no doubt as to disability." *Garrison*, 759 F.3d at 1021. F.B.'s pre- and post-DLI medical evidence, along with Dr. Bell's opinion and F.B.'s testimony, demonstrate that F.B.'s severe mental impairments have resulted in repeated episodes of psychiatric hospitalizations and symptoms that have left F.B. not only unable to work, but also unable to function in many aspects of her life. *See* A.R. 34-48; *see also id.* at 505, 498, 491, 464-84, 317-321, 651, 688, 441, 424, 403-04, 949, 950-92, 957-58, 1359-65, 1248-52, 1590, 1925, 1950, 2020-25, 1858-62, 2280-81, 2228, 2178, 1171-72, 1212-19, 2045-49, 2033.

Carefully considering the record as a whole, the court has no "serious doubt" that F.B. is in fact disabled. *See Garrison*, 759 F.3d at 1021; *see also Revels v. Berryhill*, 874 F.3d 648, 668 n.8 (9th Cir. 2017) (explaining that where each of the credit-as-true factors is met, only in "rare instances" does the record as a whole leave "serious doubt as to whether the claimant is actually disabled"). Accordingly, the Court exercises its discretion and credits the erroneously discredited opinion as true and remands this case for an immediate calculation and payment of benefits.

## V.    CONCLUSION

For the reasons discussed above, F.B.'s motion is GRANTED, the Commissioner's motion is DENIED, and the Commissioner's final decision that F.B. was not disabled is REVERSED and REMANDED for an immediate calculation and award of benefits. The Clerk is instructed to enter judgment accordingly and close the file.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated:   September 28, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge